The Honorable ____________________

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# AT NEWARK

DENNIS SHELDON BREWER, a RESIDENT OF THE STATE OF NEW JERSEY

Plaintiff,

v.

UNITED STATES SECRET SERVICE,

UNITED STATES CENTRAL INTELLIGENCE AGENCY,

UNITED STATES FEDERAL BUREAU OF INVESTIGATION,

UNITED STATES DEPARTMENT OF DEFENSE,

UNITED STATES DEPARTMENT OF JUSTICE,

UNITED STATES DEPARTMENT OF TREASURY,

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

UNITED STATES INTERNAL REVENUE SERVICE,

WASHINGTON STATE UNIVERSITY,

STATE OF WASHINGTON,

WASHINGTON STATE PATROL,

COUNTY OF KING, WASHINGTON,

COUNTY OF KING, WASHINGTON, SHERIFF'S DEPARTMENT,

LARSON HART & SHEPHERD, PLLC,

DELOITTE SERVICES LP,

DELOITTE CONSULTING L.P.,

DELOITTE CONSULTING (US) L.P.,

DELOITTE CONSULTING (US) MANAGEMENT L.P.,

DELOITTE LLP,

DELOITTE CONSULTING LLP,

DELOITTE RECAP LLC,

DELOITTE VA LLC,

Civil Action No. 10 – 3204 (SDW)

COMPLAINT FOR VIOLATIONS OF CIVIL AND CONSTITUTIONAL RIGHTS AND RACKETEERING

**DEMAND FOR JURY TRIAL**

DELOITTE AMERICAS LLC,
DELOITTE CONSULTING (AMERICAS) LLC,
DELOITTE CONSULTING FEDERAL LLC,
DELOITTE CONSULTING GROUP LLC,
DELOITTE CONSULTING LLC,
DELOITTE CONSULTING (US GLOBAL) LLC,
DELOITTE CONSULTING (US) LLC,
SHIPNOW, INC.,
KEWILL, INC.,
ESTABLISH, INC.,
HERBERT W. DAVIS & COMPANY,
PPG ARCHITECTURAL FINISHES, INC.,
CLIPPER WINDPOWER PLC LLC,
TECHNOLGY SALES LEADS, INC.,
HOPEFOUND, INC.,
PINE STREET INN, INC.,
THE WORK PLACE,
JEWISH VOCATIONAL SERVICE, INC.,
CITY OF BOSTON, MASSACHUSETTS,
INTERIM MANAGEMENT ASSOCIATES, LLC,
JOHN R. HAMILTON,
GLOBAL EXECUTIVE SOLUTIONS GROUP, LLC,
JOE MCKEON,
NEW YORK CARES, INC.,
CITY OF NEW YORK, NEW YORK,
CITY OF NEW YORK, NEW YORK POLICE DEPARTMENT,
PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
PORT AUTHORITY OF NEW YORK AND NEW JERSEY PUBLIC SAFETY DEPARTMENT,
STATE OF NEW YORK,
STATE OF CONNECTICUT,
STATE OF NEW JERSEY,
NEW JERSEY STATE POLICE,
UNKNOWN BIOMEDICAL MANIPULATION DEVICE MANUFACTURER(S),
JOHN DOE 1 THROUGH 50,
John Doe(s) LYNNE MARIE SWAIN,

| | |
|---|---|
| John Doe(s) JEANETTE ANN AUSTIN, | ) |
| John Doe(s) DARRELL C. PRAY, | ) |
| John Doe(s) CONRAD ROSS, | ) |
| John Doe(s) WILLIAM DRUMM, | ) |
| John Doe(s) MARC CHALOM | ) |
| Defendants | ) |

COMPLAINT

( ) .................................... 3

Plaintiff Dennis Sheldon Brewer, for his Complaint, avers and states as follows:

## STATEMENT OF THE CASE

1. This is an action to recover damages and to halt ongoing intentional biomedical abuse, arising out of Defendants' unauthorized Biomedical Manipulation Device implant; illegal operation of the Biomedical Manipulation Device endangering life and health; systematic, thirty-five year pattern of illegal control, peonage, civil, and constitutional rights abuse; thirty year pattern of forced labor, trafficking, involuntary servitude, penury, and economic privation; durable pattern and practice of frauds; durable pattern and practice of racketeering and racketeering enterprise; and on-going illegal detention of Plaintiff.

## A. PARTIES

2. Plaintiff, Dennis Sheldon ("Plaintiff"), is a New Jersey resident and U.S. citizen, residing in Cliffside Park, Bergen County, New Jersey.

3. Defendant SECRET SERVICE ("SECRET SERVICE") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Washington, District of Columbia. Defendant SECRET SERVICE, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

4. Defendant CENTRAL INTELLIGENCE AGENCY ("CIA") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Langley, Virginia. Defendant CIA, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

5. Defendant FEDERAL BUREAU OF INVESTIGATION ("FBI") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in

Washington, District of Columbia. Defendant FBI, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

6. Defendant UNITED STATES DEPARTMENT OF DEFENSE ("DOD") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Arlington, Virginia. Defendant DOD, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

7. Defendant DEPARTMENT OF JUSTICE ("JUSTICE") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Washington, District of Columbia. Defendant JUSTICE, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

8. Defendant DEPARTMENT OF TREASURY ("TREASURY") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Washington, District of Columbia. Defendant TREASURY on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

9. Defendant DEPARTMENT OF HOMELAND SECURITY ("HOMELAND SECURITY") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Washington, District of Columbia. Defendant HOMELAND SECURITY on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

10. Defendant INTERNAL REVENUE SERVICE ("IRS") is, on information and belief, an agency of the UNITED STATES with a principal place of operation in Washington, District of Columbia. Defendant IRS on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*11.* Defendant WASHINGTON STATE UNIVERSITY ("WSU") is, on information and belief, an agency of the State of Washington organized under the laws of the State of Washington, with a principal place of operation in Pullman, Washington.

*12.* Defendant STATE OF WASHINGTON ("STATE OF WASHINGTON") is, on information and belief, a sovereign state with a principal place of operation in Olympia, Washington. Defendant STATE OF WASHINGTON, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*13.* Defendant WASHINGTON STATE PATROL ("WSP") is, on information and belief, an agency of the State of Washington organized under the laws of the State of Washington with a principal place of operation in Olympia, Washington. Defendant WSP, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*14.* Defendant COUNTY OF KING, WASHINGTON ("KING COUNTY") is, on information and belief, a political subdivision of and organized under the laws of the State of Washington with a principal place of operation in Seattle, Washington. Defendant KING COUNTY on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

15. Defendant COUNTY OF KING, WASHINGTON, SHERIFF'S DEPARTMENT, ("KCSD") is, on information and belief, a department of Defendant COUNTY OF KING, WASHINGTON with a principal place of operation in Seattle, Washington. Defendant KCSD, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

16. Defendant LARSON HART & SHEPHERD, PLLC ("LHS") is, on information and belief, a Washington professional limited liability company with a principal place of operation in Seattle, Washington.

17. Defendants DELOITTE SERVICES LP, DELOITTE CONSULTING L.P., DELOITTE CONSULTING (US) L.P., DELOITTE CONSULTING (US) MANAGEMENT L.P., (collectively known herein as "DELOITTE") are, on information and belief, Delaware limited partnerships with a principal place of operation in New York, New York and, each and every one, direct and indirect successors in interest to Deloitte Haskins & Sells.

18. Defendants DELOITTE LLP, DELOITTE CONSULTING LLP (collectively known herein as "DELOITTE") are, on information and belief, Delaware limited liability partnerships with a principal place of operation in New York, New York and, each and every one, direct and indirect successors in interest to Deloitte Haskins & Sells.

19. Defendants DELOITTE RECAP LLC, DELOITTE VA LLC, DELOITTE AMERICAS LLC, DELOITTE CONSULTING (AMERICAS) LLC, DELOITTE CONSULTING FEDERAL LLC, DELOITTE CONSULTING GROUP LLC, DELOITTE CONSULTING LLC, DELOITTE CONSULTING (US GLOBAL) LLC, DELOITTE CONSULTING (US) LLC (collectively known herein as "DELOITTE") are, on information and belief, Delaware limited liability companies with a principal place of operation in New York, New York and, each and every one, a successor in interest to Deloitte Haskins & Sells.

20. Defendant SHIPNOW, INC. ("SHIPNOW") is, on information and belief, a Delaware corporation with a principal place of operation in Chicago, Illinois.

21. Defendant KEWILL, INC. ("KEWILL") is, on information and belief, a Delaware corporation with a principal place of operation in Chelmsford, Massachusetts, and successor in interest to the U.S. assets and customers of Defendant SHIPNOW.

22. Defendant ESTABLISH, INC. ("ESTABLISH") is, on information and belief, a Delaware corporation with a principal place of operation in Fort Lee, New Jersey.

23. Defendant HERBERT W. DAVIS & COMPANY ("DAVIS") is, on information and belief, a New Jersey corporation with a principal place of operation in Fort Lee, New Jersey.

24. Defendant PPG ARCHITECTURAL FINISHES, INC. ("PPG") is, on information and belief, a Delaware corporation with a principal place of operation in Pittsburgh, Pennsylvania.

25. Defendant CLIPPER WINDPOWER PLC LLC ("CLIPPER") is, on information and belief, a Delaware corporation with a principal place of operation in Carpinteria, California.

26. Defendant TECHNOLGY SALES LEADS, INC. ("TSL") is, on information and belief, a Massachusetts corporation with a principal place of operation in Boston, Massachusetts.

27. Defendant HOPEFOUND, INC. ("HOPEFOUND") is, on information and belief, a Massachusetts nonprofit corporation with a principal place of operation in Jamaica Plain, Massachusetts.

28. Defendant PINE STREET INN, INC. ("PSI") is, on information and belief, a Massachusetts nonprofit corporation with a principal place of operation in Boston, Massachusetts.

29. Defendant THE WORK PLACE ("TWP") is, on information and belief, a Massachusetts agency of DEFENDANT JEWISH VOCATIONAL SERVICE, INC., and DEFENDANT CITY OF BOSTON with a principal place of operation in Boston, Massachusetts.

30. Defendant JEWISH VOCATIONAL SERVICE, INC. ("JVS"), is, on information and belief, a Massachusetts corporation with a principal place of operation in Boston, Massachusetts.

31. Defendant CITY OF BOSTON ("CITY OF BOSTON") is, on information and belief, a political subdivision of and organized under the laws of the State of Massachusetts with a principal place of operation in Boston, Massachusetts.

32. Defendant INTERIM MANAGEMENT ASSOCIATES, LLC ("IMA") is, on information and belief, a Pennsylvania corporation with a principal place of operation in Pittsburgh, Pennsylvania, known to Plaintiff as Boyden Global Executive Search.

33. Defendant JOHN R. HAMILTON ("HAMILTON") is, on information and belief, a resident of Pittsburgh, Pennsylvania.

34. Defendant GLOBAL EXECUTIVE SOLUTIONS GROUP, LLC ("GESG") is, on information and belief, an Ohio corporation with a principal place of operation in Fairlawn, Ohio, and formerly known as MRI Executive Solutions, LLC.

35. Defendant JOE MCKEON ("MCKEON") is, on information and belief, a resident of Bratenahl, Ohio.

36. Defendant NEW YORK CARES, INC. ("NEW YORK CARES") is, on information and belief, a New York corporation with a principal place of operation in New York, New York.

37. Defendant CITY OF NEW YORK ("CITY OF NEW YORK") is, on information and belief, a political subdivision of and organized under the laws of the State of New York with a principal place of operation in New York, New York. Defendant CITY OF NEW YORK on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

38. Defendant CITY OF NEW YORK POLICE DEPARTMENT ("NYPD") is, on information and belief, a department of the City of New York, New York, with a principal place of operation in New York, New York. Defendant NYPD on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

39. Defendant PORT AUTHORITY OF NEW YORK AND NEW JERSEY ("PANYNJ") is, on information and belief, an agency of and organized under the laws of the States of New York and New Jersey with a principal place of operation in New York,

New York. Defendant PANYNJ, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

40. Defendant PORT AUTHORITY OF NEW YORK AND NEW JERSEY PUBLIC SAFETY DEPARTMENT ("PAPSD") is, on information and belief, an agency of and organized under the laws of the States of New York and New Jersey with a principal place of operation in Jersey City, New Jersey. Defendant PAPSD, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*41.* Defendant STATE OF NEW YORK ("STATE OF NEW YORK") is, on information and belief, a sovereign state with a principal place of operation in Albany, New York. Defendant STATE OF NEW YORK on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*42.* Defendant STATE OF CONNECTICUT ("STATE OF CONNECTICUT") is, on information and belief, a sovereign state with a principal place of operation in Hartford, Connecticut. Defendant STATE OF CONNECTICUT, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*43.* Defendant STATE OF NEW JERSEY ("STATE OF NEW JERSEY") is, on information and belief, a sovereign state with a principal place of operation in Trenton, New Jersey. Defendant STATE OF NEW JERSEY, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

*44.* Defendant NEW JERSEY STATE POLICE ("NJSP") is, on information and belief, an agency of the State of New Jersey organized under the laws of the State of New Jersey with a principal place of operation in Trenton, New Jersey. Defendant NJSP, on information and belief, does or may control other persons involved in this matter, including persons not known or knowable to Plaintiff.

45. Defendant(s) UNKNOWN BIOMEDICAL MANIPULATION DEVICE MANUFACTURER(S) is or are, on information and belief, other United States persons, not presently known or knowable to Plaintiff, to be added through the discovery process.

46. Defendants JOHN DOE 1 THROUGH 50 are, on information and belief, other persons, and law enforcement, intelligence, and other government agencies not presently known to Plaintiff, to be added through the discovery process.

47. John Doe(s) Defendant LYNNE MARIE SWAIN ("SPOUSE1"), previously known as Lynne Marie Cummings while unmarried, Lynne Marie Boyle while previously married to Gregory Boyle, and known as LYNNE MARIE BREWER while ostensibly married to Plaintiff is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants, including, without limitation, the Defendant DOD, may have information relevant to the identities and whereabouts of these persons.

48. John Doe(s) Defendant JEANETTE ANN AUSTIN ("SPOUSE2"), known as Jeanette Ann Hansen while married to Bruce Hansen, known as Jeanette Ann Smith while married to Larry Smith, JEANETTE ANN BREWER while allegedly married to Plaintiff is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants, including, without limitation, the Defendant DOD, may have information relevant to the identities and whereabouts of these persons.

49. John Doe(s) Defendant DARRELL C. PRAY ("PRAY") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants, including, without limitation, the Defendant DOD, may have information relevant to the identities and whereabouts of these persons.

50. John Doe(s) Defendant CONRAD ROSS ("ROSS") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET

SERVICE, though other Defendants may have information relevant to the identities and whereabouts of these persons.

51. John Doe(s) Defendant WILLIAM DRUMM ("DRUMM") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants may have information relevant to the identities and whereabouts of these persons.

52. John Doe(s) Defendant MARC CHALOM ("CHALOM") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants may have information relevant to the identities and whereabouts of these persons.

**False, Misleading, Fraudulent And Defunct Persons And Identities Used By Defendants**

53. On information and belief, persons which follow in paragraphs 55 through 69, were or are cover operations and identities which, together with conducting ordinary commercial business and living ordinary lives, were or are organized and staffed for the purpose of gathering intelligence by and for the aforementioned Defendants, including, without limitation, law enforcement and intelligence gathering agencies, and are therefore, in fact, not separate persons, but one and the same as their parent or controlling person, including, without limitation, departments and agencies of the United States, the several States, and other political subdivisions organized under the laws thereof. The identity of the parent department, agency, or other entity is not obvious to Plaintiff, but on information and belief, Plaintiff identifies the following persons, and false and cover identities, related to Defendants, to be established by the Defendants at the direction of the Court, for purposes of facilitating discovery, collection of evidence, identifying the whereabouts of key witnesses, securing documents, including those pertaining to operations of purposefully defunct persons, as reasonably required by Plaintiff to successfully prosecute this

Complaint. These persons include persons listed as John Doe Defendants above whose actual names and whereabouts are unknown to Plaintiff.

54. Together with their related and affiliated persons and identities, these persons and their Defendant parent, and directly or indirectly controlling department or agency, are one and the same, and comprise a common enterprise under 18 U. S. C. §1961.

55. Defendants ESTABLISH, DAVIS, TSL, SHIPNOW, KEWILL, NEW YORK CARES, and Deloitte Haskins & Sells successors in interest collectively known herein as Defendant DELOITTE, have been used by Defendants, as persons which are cover enterprises closely associated with ordinary commercial enterprises of the same or very similar names, or as cover enterprises, in wrongful and illegal activities of the Defendants against Plaintiff, while also engaged in ordinary commercial business.

56. NETWORK IMAGING SYSTEMS CORPORATION ("NISC") was, on knowledge and belief, a Delaware corporation with a principal place of operation in Vienna, Virginia and was the successor in interest of LAZERSOFT, INC. ("LAZERSOFT"), and LASERACCESS, INC. ("LASERACCESS"). LAZERSOFT was, on information and belief, a Washington corporation with a principal place of operation in Bothell, Washington. LASERACCESS, successor in interests to LAZERSOFT was, on information and belief, a Washington corporation with a principal place of operation in Bothell, Washington.

57. STEVE'S MAINTENANCE, INC. ("STEVE'S MAINTENANCE") was, on information and belief, a Washington corporation with a principal place of operation in Auburn, Washington. Successor corporation through acquisition of assets and assignment of contracts ALLIANCE ENVIRONMENTAL SERVICES CORPORATION ("ALLIANCE") was, on information and belief, a Washington corporation with a principal place of operation in Auburn, Washington.

58. P.A.N. ENVIRONMENTAL SERVICES CORPORATION ("PAN") was, on information and belief, a Delaware corporation with a principal place of operation in Seattle, Washington.

59. PACIFIC PIPELINE, INC. ("PACIFIC PIPELINE") was, on information and belief, a Washington corporation with a principal place of operation in Kent, Washington.

60. CNA INDUSTRIAL ENGINEERING, INC. ("CNA") was, on information and belief, a Washington corporation with a principal place of operation in Woodinville, Washington.

61. ALLEGENT, LLC, doing business as PERFORMA ("PERFORMA") was, on information and belief, a limited liability company with a principal place of operation in Bellevue, Washington.

62. SOFTSELECT SYSTEMS, LLC was, on information and belief, a Washington limited liability company with a principal place of operation in Vancouver, Washington.

63. PACER (WASHINGTON), INC. ("PACER"), was, on information and belief, a Washington corporation, with headquarters in Bothell, Washington, and a subsidiary of Wembley plc, a corporation domiciled in Great Britain.

64. John Doe(s) Defendant LYNNE MARIE SWAIN ("SPOUSE1"), previously known as Lynne Marie Cummings while unmarried, Lynne Marie Boyle while previously married to Gregory Boyle, and known as LYNNE MARIE BREWER while ostensibly married to Plaintiff is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants, including, without limitation, the Defendant DOD, may have information relevant to the identities and whereabouts of these persons.

65. John Doe(s) Defendant JEANETTE ANN AUSTIN ("SPOUSE2"), known as Jeanette Ann Hansen while married to Bruce Hansen, known as Jeanette Ann Smith while married to Larry Smith, JEANETTE ANN BREWER while allegedly married to Plaintiff is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants, including, without limitation, Defendant DOD, may have information relevant to the identities and whereabouts of these persons.

66. John Doe(s) Defendant DARRELL C. PRAY ("PRAY") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants, including, without limitation, the Defendant DOD, may have information relevant to the identities and whereabouts of these persons.

67. John Doe(s) Defendant CONRAD ROSS ("ROSS") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants may have information relevant to the identities and whereabouts of these persons.

68. John Doe(s) Defendant WILLIAM DRUMM ("DRUMM") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants may have information relevant to the identities and whereabouts of these persons.

69. John Doe(s) Defendant MARC CHALOM ("CHALOM") is, on information and belief, an identity comprised of several persons, most likely known to the Defendant SECRET SERVICE, though other Defendants may have information relevant to the identities and whereabouts of these persons.

## JURISDICTION AND VENUE

70. This action is based upon the First, Fourth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments to the US Constitution, United States Code Chapter 18 sections 241, 242, 245, 246, 654, 798, 872, 892, 894, 895, 1341, 1343, 1460, 1461, 1505, 1512, 1513, 1581, 1589, 1590, 1593A, 1702, 1951, 1952, 1956, 1959, and 2236; New Jersey Revised Statutes ("R.S.") 10:1-1, R.S. 10:1-2, R.S. 10:1-7, and R.S. 2C:33-14(7); Revised Code of Washington ("RCW") 49.52.070, RCW 26.04.130, RCW 9.35.010, RCW 9.38.020, RCW 9A.60.040, RCW 9A.60.030, and RCW 9A.60.050; and related common law of Massachusetts, New Jersey, and Washington.

71. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1595 and 18 U.S.C. § 1965.

72. The case is based upon systematic violations of the constitutional rights of the Plaintiff by Defendants under the First, Fourth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments to the U.S. Constitution. The Court has subject matter jurisdiction pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

73. Assertion by Defendants which are agencies or departments of the United States of a state secrets privilege under United States v. Reynolds, 345 U.S. 1 (1953), directly and specifically defies the logic of the Thirteenth Amendment to the United States Constitution, adopted as a direct result of the most imperiling national security emergency in the history of the United States, and immediately upon the conclusion of that national security emergency. Under the Thirteenth Amendment, no person can engage another in involuntary servitude.

74. Venue is proper in the District of New Jersey pursuant to 18 U.S.C. § 1595 and 18 U.S.C. § 1965, et. seq. Defendants have entered, and are currently engaged in biomedical manipulations of the Plaintiff in this district, practiced reckless endangerment in New Jersey, are conducting operations through New Jersey business and other persons, and are otherwise conducting operations in the state of New Jersey, a substantial part of the events giving rise to the claims occurred in this district, and a substantial part of the injury to Plaintiff that is the subject of this action, occurs in this district.

## **PLAINTIFF AND HIS RIGHTS**

75. Plaintiff Dennis Sheldon Brewer ("Plaintiff"), attended Washington State University (Defendant "WSU"), Pullman, Washington from September 1975 through June 1977, to obtain a Bachelor of Arts degree in Business Administration. On information and belief, in approximately the Fall of 1975, Defendants CIA, DOD and SECRET SERVICE acted in

collaboration to implant a Biomedical Manipulation Device into Plaintiff without his consent during his residency in Perham Hall on the Defendant WSU campus. Defendant

76. On knowledge and belief, the Defendants CIA, DOD, and SECRET SERVICE team responsible for device implantation and subsequent security and illegal control of Plaintiff included Craig Page, Mike Cunha, Lynne Sorenson, James Carberry, William Sackville-West, Bob Ross, Linda Pogreba, Karen Raines, Andrew Ng and others not known to Plaintiff residing in the Perham Hall dormitory residence or attending classes with Plaintiff. Plaintiff subsequently resided with Andrew Ng in 1975 and 1976 and with Craig Page from 1975 to 1977 while attending Defendant WSU.

**<u>Biomedical Manipulation Device Implanted And Operated</u>**

**<u>Without Consent</u>**

77. On knowledge and belief, Defendants implanted Biomedical Manipulation Device is a battery powered ceramic encapsulated device activated by radio frequency using an electronic serial number addressable system to manipulate and shock Plaintiff's central nervous system with commanded amounts of electric current at various frequencies to stimulate certain nerve responses. On knowledge and belief, the Biomedical Manipulation Device was inserted through the esophagus and surgically glued in Plaintiff's stomach.

78. The Biomedical Manipulation Device's internal battery is inductively charged using electromagnetism, as it resides in Plaintiff's stomach. Plaintiff is unable to determine the method used for the battery charging process while attending Defendant WSU, while married to Defendant SPOUSE1, or at other times prior to 1990, due to the remoteness in time, Plaintiff's frequent use of hotel rooms during travel, and the presence of multiple residents in shared residences. On knowledge and belief, this charging process was accomplished by Plaintiff's ostensible spouse, Defendant SPOUSE2, during middle of the night sessions then unknown to Plaintiff while allegedly married, to facilitate the allergy symptoms, related pain, consequent infections, and other symptoms described in this Complaint. On knowledge and belief, this recharging process was undertaken by Defendant

SECRET SERVICE agents and/or other Defendants during sessions while Plaintiff slept in a Boston area homeless shelter from 2006 to 2007, and in his Cliffside Park, NJ apartment from 2008 to the present time, by means described later in this Complaint.

79. Defendants received and implanted the device as a result of their consortium and contractual relationship with other Defendant(s) in this Complaint. Defendant(s) UNNAMED BIOMEDICAL MANIPULATION DEVICE MANUFACTURER(S), not known or knowable to Plaintiff, which Defendant(s) UNNAMED BIOMEDICAL MANIPULATION DEVICE MANUFACTURER(S) knew or should have known that the implantation of this device in Plaintiff, a U.S. person, without Plaintiff's consent, is a violation of the United States Constitution, the United States Code, and the laws of the State of Washington, would endanger the life and health of Plaintiff, and, at this and all other times, failed to act to protect Plaintiff's life, health, and civil and constitutional rights.

80. On knowledge and belief, this Biomedical Manipulation Device affects the central nervous system, muscular control, and brain chemistry of the individual in whom it is implanted, causing Plaintiff, and, on knowledge and belief, others in whom the device has been implanted, to act out behaviors and engage in conduct in ways they would not otherwise behave or conduct themselves. The consequences of these biomedical manipulations are injurious, dangerous, and potentially fatal to the Plaintiff, to others in whom the Biomedical Manipulation Device is implanted, and to all others nearby, including public safety officers and the general public.

81. Plaintiff suffered for many years from allergies which, on knowledge and belief, were artificially induced by the Biomedical Manipulation Device. Allergy symptoms began while Plaintiff was attending college in 1975, causing Plaintiff's extended use of the drug Pseudoephedrine and medically prescribed steroids including Fluticasone Propionate, and the related side effects, for more than thirty years. Plaintiff also required periodic doses of the drug Prednisone over a period of more than ten years, attempted the use of a medical doctor allergist's interventions including an extended course of allergen injections and prescribed

drugs over many months which were unsuccessful, was forced to undergo sinusoidal surgery in an effort to relieve the symptoms, and suffered related medical risks and side effects.

82. On knowledge and belief, Georgina Engberg, an agent of Defendants, arranged with Defendant SPOUSE2 to introduce and maintain a small dog in Plaintiff's residence. The dog, handled by Plaintiff as encouraged by Defendant SPOUSE2, had fecal material, allergens, and infections, which together with facial itches and allergy symptoms induced by Defendants Biomedical Manipulation Device, were instrumental in developing numerous sinus infections, causing Plaintiff to seek medical attention and be prescribed antibiotics. Plaintiff developed an allergic reaction to sulfa-based drugs as a result of the frequency and intensity of the required use of antibiotics.

83. These allergy symptoms and related infections ceased for a time when Plaintiff was separated from dog and moved to Boston in 2005. Allergy and other symptoms returned in 2006 after Plaintiff entered a homeless shelter operated by Defendants with access to and control of the Biomedical Manipulation Device, and Plaintiff was again forced to seek prescriptions and other medical attention.

84. In early 2010, these allergy symptoms ceased, causing Plaintiff to suspend use of prescription steroid drug Fluticasone Propionate, but selected symptoms, not in the same pattern as originally experienced by Plaintiff, subsequently returned in very specific, brief episodes in conjunction with an overall pattern of very aggressive use of the Biomedical Manipulation Device by Defendants. Plaintiff does not currently use the daily steroid Fluticasone Propionate he had used for more than fifteen years and does not suffer the persistent and sometimes overwhelming chronic allergy symptoms he suffered during this time.

85. Allergy symptoms were a chronic daily occurrence from 1975 to 2010, except for a few weeks from approximately late December 2005 to May 2006. On knowledge and belief, more than thirty years of allergy symptoms, the accompanying pain, headaches, periodic

infections, surgery, drugs including anti-inflammatory steroids and antibiotics, resultant antibiotic allergy, and other medical interventions, were all or substantially all the result of biomedical abuse by the Defendants.

86. Defendants' Biomedical Manipulation Device has also caused prolonged periods of severe stomach pain and production of excess acids, causing Plaintiff to seek medical attention and requiring chronic use of the drug Raninitide and other prescription and non-prescription antacids since the 1980s. Plaintiff was diagnosed with a hiatal hernia, a protrusion of the upper part of the stomach into Plaintiff's thorax, in the late 1990s as a result of Defendants biomedical abuse. Defendants have very aggressively used the Biomedical Manipulation Device against Plaintiff's stomach since 2008, frequently attacking this point of Plaintiff's chronic medical vulnerability for hours each day.

87. Defendants use of the Biomedical Manipulation Device causes nervous system blackouts and freezes; overpowers and disrupts concentration and the thought process; and induces various other medical symptoms, including headaches, and muscle and organ over expansion or excessive contraction, such as in the eyes, heart muscle, colon, arm, leg, and lower back. As an involuntary medical subject under control of Defendants, Plaintiff has experienced loss of use and disabling pain in muscles and muscle groups, lasting minutes to many hours, with frequent repetition, in heart, colon, legs, knees, arms, and stomach, among others.

88. Defendants' Biomedical Manipulation Device causes embolisms and similar symptoms in bowels, stomach, and heart through fluid gas separation. These embolisms, including repetitive biomedical abuse of Plaintiff's lower left leg, where he experienced deep vein thrombosis in 1994, and of Plaintiff's heart, are potentially fatal.

89. Defendants have also induced symptoms including immense stress, rage, depression, panic, and fear. Plaintiff is a not an angry, fear prone, or nervous individual. Plaintiff is a licensed pilot, has skydived, rock climbed, led rafting and canoeing trips on large scale rivers, led training seminars for senior executives of client companies and senior

government officials, testified before state legislative committees, served as Chair of several industry and government Boards and Task Forces, and engaged in extensive public speaking as part of his industry volunteer and marketing activities. Plaintiff has had intensive contact with law enforcement and intelligence personnel for many years and has no record of adverse contact with clients, family, police, government officials, or any other institution.

90. Plaintiff experienced various combinations of more extreme biomedical abuse symptoms thousands of times between 2008 and 2010. Plaintiff experienced various combinations of more extreme biomedical abuse symptoms thousands of times during prior episodes previously believed by Plaintiff, at the time of their occurrence, to relate to major life events, such as divorce, business failure, and unemployment, such as, without limitation, in 1993 and 2004. On knowledge and belief, all these symptoms and their dangerous and adverse consequences to Plaintiff are actually the direct consequences of millions of instances of willful, illegal commanded uses of the Biomedical Manipulation Device by Defendants, each specific reaction of nerves and manifestation of symptoms in Plaintiff requiring a distinct command to be issued in a nearly continuous stream of commands to the Biomedical Manipulation Device to artificially create and sustain each and every moment of every adverse consequence to Plaintiff.

**Entanglement In National Security Affairs To Control**

**Plaintiff's Movements And Activities**

*91.* Plaintiff also attended Defendant WSU from February 1978 to June 1979, to obtain a Masters of Business Administration ("MBA") degree. Plaintiff was introduced in 1978 to Gerald THORPE, on knowledge and belief, a surreptitiously placed agent of the State of Israel, then also attending the WSU MBA program. On knowledge, and belief, THORPE was the subject of an extensive Defendant CIA and Defendant SECRET SERVICE credentials building operation over the years he was known to Plaintiff, which included his close relationship with Plaintiff.

92. Plaintiff was also introduced to John L Zoulas ("Zoulas") in 1978, on knowledge and belief, an agent of Defendant SECRET SERVICE. On knowledge and belief, Agent Zoulas later engaged in domestic support for Defendant CIA operations through his employment in the Human Resources Department at Westin Hotels Executive Offices in Seattle, Washington.

93. Plaintiff was also introduced to Kim Epskamp in 1978, on knowledge and belief a Defendant SECRET SERVICE agent, who later appeared to Plaintiff as ostensible workout officer for US Bank, in Portland, Oregon, during the financial collapse of PACIFIC PIPELINE, described later in this Complaint.

94. Plaintiff was employed as a graduate Teaching Assistant, and assigned an office at Defendant WSU in 1978 with Muhamad Bahari-Kashani, an Iranian national and PhD candidate in Economics, who, on knowledge and belief, maintained a relationship with Defendant CIA and Defendant SECRET SERVICE while at Defendant WSU, and was trapped in the U.S. as the Shah of Iran fell. Plaintiff later encountered Bahari-Kashani providing tax seminars at the Westin Hotel in Seattle, Washington.

95. While attending Defendant WSU and for many years thereafter, Plaintiff had no knowledge of the implantation of the Biomedical Manipulation Device as any symptoms noted by Plaintiff appeared gradually and would not normally be associated with a single form of causation. Plaintiff was similarly unaware of purposeful clustering of Defendants personnel to protect the Biomedical Manipulation Device at Defendant WSU and elsewhere, or of the confidential relationships among Defendant WSU, other Defendants personnel allegedly or actually attending Defendant WSU while engaging in illegal acts and violations of Plaintiff's rights on behalf of Defendants; or of relationships among the various Defendants employees or agents, at the time of these events, or for many subsequent years.

96. After graduating from Defendant WSU, Plaintiff was employed in the Seattle, Washington offices of Defendant DELOITTE, as a result of an introduction by Paul Shaffer ("Shaffer"), a Defendant WSU professor for whom Plaintiff worked as a graduate Teaching

Assistant while at Defendant WSU. Shaffer arranged a Defendant DELOITTE interview for Plaintiff in Denver, Colorado, and was referred by Defendant DELOITTE personnel in Denver to the Seattle office.

97. Recently, Plaintiff was able to trace this pattern of events and determine that his employment while a graduate student at Defendant WSU, and subsequent pattern of periods of employment and unemployment are, in fact, a continuing illegal subterfuge by Defendants to maintain control of Plaintiff and the illegally implanted Biomedical Manipulation Device through peonage, forced labor, trafficking, and other illegal acts of Defendants described in this Complaint.

98. None of the Defendants, including, without limitation, Defendant WSU, Defendant WSP, Defendant STATE OF WASHINGTON, Defendant DOD, Defendant CIA, Defendant SECRET SERVICE, Defendant TREASURY, and Defendant HOMELAND SECURITY or its predecessor agencies acted, during this or any subsequent period of time, to protect Plaintiff's civil and constitutional rights despite an affirmative legal and constitutional duty to do so, nor to direct agencies and departments under their control to act in accordance with the laws and Constitutions of their jurisdictions and perform their mandated functions in this matter.

**Control of Personal Relationships by Biomanipulation and Other Practices**

99. Plaintiff was employed in the Seattle offices of Defendant DELOITTE then operating as Haskins & Sells, and subsequently as Deloitte Haskins & Sells, in approximately August 1979. During late 1979 or early 1980, Plaintiff met Lynne M. Boyle (Defendant "SPOUSE1"), a fellow Defendant DELOITTE employee working on the financial audit of Safeco Insurance in Seattle, Washington. On knowledge and belief, this audit was actually an operation of the Defendants, on knowledge and belief, Defendant SECRET SERVICE, to maintain surveillance of the Biomedical Manipulation Device implants in Plaintiff and Defendant SPOUSE1, while engaged in ordinary commercial

business. After a period of dating, Plaintiff moved in with and later married Defendant SPOUSE1.

100. On knowledge and belief, Defendant SPOUSE1 experienced biomedically manipulated periods of anger; multiple fainting episodes, including one with a resulting concussion requiring emergency hospitalization due to a fall from a bicycle; episodes of angry and irrational thought processes; strong sexual desire; and other symptoms from operation of the Biomedical Manipulation Device which closely parallel Plaintiff's own experience with the implanted Biomedical Manipulation Device.

101. On knowledge and belief, members of Defendant SPOUSE1's family, including her father and brother were active and/or formerly active members of overt and covert Defendant DOD operations in the U.S. Navy. On knowledge and belief, members of the staff of the Seattle, Washington office of Defendant DELOITTE were active and covert employees of Defendant DOD. Their presence in personal and professional settings facilitated the process of tracking, manipulating, and illegal control of Plaintiff.

102. On knowledge and belief, Plaintiff and Defendant SPOUSE1 were placed together in the Defendant DELOITTE audit unit at Safeco's headquarters in Seattle, Washington to isolate them from most other staff members in their 100 plus person office, and maintain illegal subjugatory control of both individuals and of the implanted Biomedical Manipulation Devices. This audit unit was under the direct supervisory control of Margaret Dufresne and Boh A. Dickey ("Dickey"), on knowledge and belief, both agents of Defendant SECRET SERVICE. Dickey later became Chief Executive Officer of Safeco.

**Failure to Protect And Orchestrated Interventions**

103. Plaintiff was introduced in late 1979 or early 1980 through Margaret Dufresne ("Dufresne"), an agent of Defendant SECRET SERVICE and a Defendant DELOITTE manager in the Safeco audit unit, to Bruce Ciosacchi ("Ciosacchi"), who identified himself as an agent of Defendant FBI. Plaintiff, Defendant SPOUSE1, Ciosacchi, and Dufresne, known to Plaintiff as Ciosacchi's spouse, frequently spent time in each others company over

the next several years. Defendant FBI knew or should have known of the systematic violation of Plaintiff's rights by other Defendants.

104. Defendant FBI did, on knowledge and belief, videotape Plaintiff placing an ostensibly drunken Dufresne in the back seat of his vehicle in a parking lot adjacent to State Highway 520 in Bellevue, Washington, as Defendant FBI's agent Ciosacchi observed from the driver's seat of a nearby vehicle, during the course of their acquaintance. On knowledge and belief, Defendant FBI staged this made up event for the purpose of deflecting possible criticism of its Seattle, Washington Field Office operations for its failure to protect Plaintiff, Defendant SPOUSE1, and others as a result of its knowledge of the ongoing violations by other Defendants.

105. Plaintiff was employed on various projects for Defendant DELOITTE including, on knowledge and belief, consulting projects which were, in fact, follow-on projects intended to obscure the existence of prior intelligence operations conducted by Defendant FBI in Pierce County, Washington, subsequent to the prosecution of former Pierce County Sheriff George Janovich on corruption charges. Plaintiff was also engaged by Defendants, acting as his Defendant DELOITTE employer, in intelligence gathering in selected major school districts in various parts of the U.S.; in projects to train Federal Deposit Insurance Corporation examiners and agents of Defendants related to a series of banking failures throughout the U.S. in the 1980s; and other projects, including ordinary commercial projects.

106. As an employee of Defendant DELOITTE, Plaintiff was asked by Zoulas, in late 1982 or early 1983, to conduct a productivity analysis and labor cost reduction study for the Westin Hotel in Seattle, Washington. During the course of this project, Plaintiff met Jim Treadway ("Treadway"), then General Manager of the Seattle Westin. Treadway had previously managed the construction and opening of the Westin Hotel in Johannesburg, South Africa. On knowledge and belief, the Johannesburg Westin Hotel was later used in a Defendant CIA project, described later in this Complaint.

107. Plaintiff employed THORPE, who had become an employee of Defendant DELOITTE as a result of Plaintiff's referral, to perform work on the Westin Hotel project. THORPE and Plaintiff subsequently formed Sheldon-Lee Associates, invested personal funds in the company in equal shares, and developed the Activ-Labor software product.

108. Plaintiff, Defendant SPOUSE1, THORPE, and THORPE's spouse maintained a close personal relationship until THORPE was assigned to the Saudi Arabian Airlines software implementation project later in the 1980s and relocated by Defendant DELOITTE to Riyadh, Saudi Arabia.

109. On knowledge and belief, this project, which also involved John R. Blair, a Director in the Seattle office of Defendant DELOITTE, and Defendant DELOITTE personnel from other offices in the U.S., was a Defendant CIA project to gather intelligence information from the ongoing operations of Saudi Arabian Airlines.

110. The infiltration of THORPE, on knowledge and belief, an Israeli national, was undertaken by the Defendant DELOITTE project team.

111. The probable subsequent use of information, gathered from the implemented software systems in this project of Defendant CIA, to support assassination operations by the government of Israel against Saudi nationals and others, were violations of U.S. law, policy, and Executive Orders, and were not known to Plaintiff at the time. These activities, undertaken by Defendant CIA Directorate of Operations, were Acts of War, in explicit defiance of U.S. Presidential Executive Orders 11905, 12036, and 12333.

112. Plaintiff had no connection to the Saudi Arabian Airlines project, and was unaware of the nature, purpose, intent, or existence of these operations at the time, considering himself employed in a normal consulting position in a private enterprise.

113. Defendant DELOITTE was the first of many such intelligence cover operations appearing as ordinary commercial businesses to Plaintiff but controlled, directly or indirectly, by the Defendants, which employed Plaintiff, without his knowledge or consent, as a method of maintaining control of Plaintiff, and perpetuating Defendants pattern of

peonage, forced labor, and trafficking of Plaintiff, in the implementation, execution, and termination of domestic or international intelligence operations by Defendants SECRET SERVICE, CIA, FBI, and other Defendants.

**Forced Labor And Entanglement In**
**US Anti-Apartheid National Security Activities**

114. In or about 1984, Plaintiff was also introduced to David Moller ("Moller"). Moller, a financial services industry specialist, was project manager for Defendant DELOITTE's project in Johannesburg, South Africa, to install an automated teller machine network in the banking system in South Africa, shortly before the implementation of economic sanctions against South Africa.

115. On knowledge and belief, this project was conducted for the purpose of gathering financial information and initiating economic instability operations against the apartheid practices of the Government of South Africa by Defendant CIA. Some time after Moller's return to the U.S., he was terminated from Defendant DELOITTE and found employment as President and Chief Executive Officer of LAZERSOFT, a Seattle area startup business in laser optic technology.

116. Plaintiff subsequently joined LAZERSOFT in the Fall of 1986 in a financial position as a result of pressure on Plaintiff by Michael Henderson ("Henderson"), on knowledge and belief, an agent of Defendants and a Partner employed by Defendant DELOITTE. Henderson informed Plaintiff that his performance had declined, despite an unblemished history of very high personnel evaluations, despite Plaintiff's excellent work on regionally and nationally important, high visibility projects, and despite Plaintiff's success in passing the examination to obtain certification as a Certified Public Accountant with virtually no formal training in accounting.

117. Approximately 90 days after Plaintiff joined LAZERSOFT, Moller was ostensibly terminated by LAZERSOFT's Board of Directors, which selected Plaintiff as his replacement. On knowledge and belief, this process was undertaken by Defendants to

maintain operational security by making it more difficult for others to track Moller's movements subsequent to the South Africa project.

118. LAZERSOFT encountered substantial difficulties in its startup operations, product development process, sales, marketing, and financing. Plaintiff devoted his full time and attention to these issues, unaware that the staff of the company was primarily comprised, on knowledge and belief, of employees or contractors of Defendant SECRET SERVICE, who together with other Defendant SECRET SERVICE employees in the adjacent offices of AcA, were there to track and control Plaintiff and the Biomedical Manipulation Device previously implanted.

119. As LAZERSOFT's products began to enjoy market acceptance, Plaintiff worked in 1988 to develop venture capital financing for the company. After months of work, Plaintiff secured a multi-million dollar financing commitment from WALDEN, and two other venture capital funds. As the financing was set to close, Plaintiff received a telephone call from LAZERSOFT's legal counsel, indicating WALDEN was reneging on its financing commitment. The two other venture capital firms offered to remain in the financing deal if another lead investor could be found to replace WALDEN. Plaintiff worked to secure an alternate lead investor. Before an alternate lead investor could be found, PACER made its second offer to acquire LAZERSOFT, which LAZERSOFT's Board of Directors accepted without negotiating any of the proposed terms.

120. LAZERSOFT was sold under duress and over objections of Plaintiff, while Plaintiff was acting as its Chief Executive Officer, to PACER. On knowledge and belief, PACER engaged in the gathering of intelligence information in the U.S. and other countries through its operations in the movie and entertainment industries, and was directly or indirectly controlled by Defendants.

121. During the course of the forced sale of LAZERSOFT to PACER, Plaintiff was threatened with termination by a member of LAZERSOFT's Board of Directors, Rod Proctor, on knowledge and belief, an employee of Defendant SECRET SERVICE.

122. This termination threat to Plaintiff, and the actions of Defendant LAZERSOFT's Board members, deprived Plaintiff of substantially all the benefits of his labor and of the prospect of appreciation from his intellectual and managerial contributions to the success of the operation, just as it was beginning to enjoy market acceptance of its products.

123. Plaintiff, acting with a co-employee Stephen Waters ("Waters"), on knowledge and belief an employee of Defendant SECRET SERVICE, attempted to repurchase LAZERSOFT, then known as LASERACCESS Corporation from PACER's parent, Wembley plc, some years later, but the company was sold to Network Imaging Systems Corporation ("NISC"), Vienna, Virginia, after an ostensible adversarial proceeding related to intellectual property allegedly before Judge Barbara Dimmick in the U.S. District for Western Washington. On knowledge and belief, the U.S. Marshalls Service, an agency of Defendant JUSTICE arranged for Defendant SECRET SERVICE attorneys representing Waters and the ostensible NISC client and their legal team to use Judge Dimmick's courtroom for a moot adversarial proceeding, representing this proceeding to Plaintiff as an actual proceeding, on a day when no other business was occurring in the Courthouse.

124. After his termination during the acquisition of LAZERSOFT in 1989, and a subsequent period of unemployment, Plaintiff was employed in, on knowledge and belief, a further series of intelligence operations. Cycles of employment, unemployment, and financial difficulties would characterize the remainder of Plaintiff's peonage, forced labors, and trafficking at company's ostensibly owned by Plaintiff as well as through contrived employment and terminations from what appeared to be ordinary commercial employment but, on knowledge and belief, were, each and every one, cover operations conducted by and for Defendants SECRET SERVICE, FBI, CIA, other Defendants, and a variety of other police powers persons not known to Plaintiff.

**<u>Biomedical Manipulation Influence On Marital Relationship</u>**

125. On knowledge and belief, Defendant SPOUSE1 was engaged in an extramarital affair with Bob Swain ("Swain") during approximately 1986 to 1988, and allegedly later

married Swain. On knowledge and belief, Swain was a government employee of Defendants surreptitiously working in the same telecommunications firm as Defendant SPOUSE1 prior to and at the time of the dissolution. On knowledge and belief, Plaintiff's long absences due to extended out of town work assignments by Defendants, and Defendants illegal operation of the Biomedical Manipulation Device implanted in Defendant SPOUSE1 played a substantive role in this affair and dissolution.

126. Plaintiff and Defendant SPOUSE1 were divorced in 1988 or 1989. This date is estimated as Plaintiff currently lacks access to his own records due to a series of programmed relocations and his forced penury at hands of Defendants. Substantially all the assets of the marital community were awarded to Defendant SPOUSE1 in the dissolution proceeding. Defendant SPOUSE1 allegedly married Mr. Swain very soon after the divorce. Defendants were establishing their pattern of asset stripping and equity skimming of real property of Plaintiff to maintain their illegal control of Plaintiff

127. Mr. Swain visited Plaintiff's Cliffside Park, New Jersey apartment in Spring 2010 in the company of the ostensible landlord and owner, Defendant CHALOM. On knowledge and belief, Swain and Defendant CHALOM are employees of, and operate under covers created by, Defendant SECRET SERVICE.

**Control of Personal Relationships and Failure to Protect**

128. Plaintiff was introduced to a person or person he came to know as Jeanette A. Smith (Defendant "SPOUSE2") in 1988 in an operation conducted by Waters and other agents and employees of Defendants, a fellow employee at LAZERSOFT, during the pendency of Plaintiff's divorce from Defendant SPOUSE1. Plaintiff subsequently married Defendant SPOUSE2 in 1990.

129. Soon after Plaintiff met Defendant SPOUSE2, Defendant SPOUSE2 introduced Laurie and Kerry Vanderberry to Plaintiff. Kerry Vanderberry introduced himself as an agent of Defendant FBI. During the course of their several year acquaintance, Plaintiff observed Laurie Vanderberry's pregnancy, babysat their infant son a number of times after

his first birthday, and discussed Kerry Vanderberry's pending travel to assist in the arrest of a suspect in Oregon, as well as the Vanderberry's eventual hardship transfer to Texas related to the poor health of Kerry Vanderberry's father.

130. Defendant FBI knew or should have known of Plaintiff's peonage, forced labors, and trafficking and other violations of rights by Defendants. Defendant FBI did not undertake to investigate or evaluate Plaintiff's circumstances but participated fully in the ongoing operations of Defendants and used Plaintiff in other operations.

131. On knowledge and belief, one version of Defendant SPOUSE2 experienced symptoms of biomedical manipulation which parallel those experienced by Plaintiff, including some not experienced by Plaintiff until the 2008 to 2010 period. Plaintiff took Defendant SPOUSE2 to the emergency room of a local hospital on at least one occasion when Defendant SPOUSE2 was unable to control symptoms of panic and anxiety. Defendant SPOUSE2 developed a series of untreatable cysts on her face, and had episodes of depression, rage, and other symptoms which parallel Plaintiff's own experience with the Biomedical Manipulation Device.

132. On knowledge and belief, members of Defendant SPOUSE2's family, including her father and brother were active and/or formerly active members of overt and covert Defendant DOD operations in the U.S. Air Force. On knowledge and belief, employees of the various Seattle, Washington area employers and companies ostensibly owned by Plaintiff were active and covert employees of various departments and agencies with intelligence matters in their jurisdiction. Their presence in personal and professional settings facilitated the process of tracking, manipulating, and illegal control of Plaintiff.

133. On knowledge and belief, a number of persons were used in the role of Defendant SPOUSE2, as Plaintiff's companion, then as married Defendant SPOUSE2, and subsequently as estranged Defendant SPOUSE2, between the time he met Defendant SPOUSE2 in 1988 and was divorced in 2005. On knowledge and belief, this was accomplished in part by Defendants' abuse of gay female soldiers of Defendant DOD in this

role. The relationship was characterized by substantial financial stress, a series of breakups, extensive counseling to little or no effect, and repeated, lengthy periods of separation under adverse conditions, with Plaintiff being forced to leave his residence for several months on two or more occasions, and his alleged spouse, Defendant SPOUSE2, leaving the residence for several months on three or more occasions, over the fifteen year history of the alleged marriage.

134. Plaintiff and Defendant SPOUSE2 also suffered significant anxieties over symptoms of mental illness demonstrated by Bryce Hansen, Defendant SPOUSE2's son, beginning at the age of 19 and lasting approximately ten years until Plaintiff left the Seattle, Washington area in 2005. Bryce Hansen's apparent or feigned mental illness resulted in several visits by officers of Defendant KCSD to Plaintiff's residence during this period due to various uncontrolled outbursts and two reported assaults on Defendant SPOUSE2, his mother.

135. Plaintiff had previously become familiar with and to the Defendant KCSD as a result of his marital association with Defendant SPOUSE1, allegedly twice previously married to Gregory R. Boyle ("Boyle"), a Commander of Defendant KCSD's Maple Valley, Washington precinct operations and of its Green River Task Force, a joint operation with Defendant FBI and others. Boyle had nearly bi-weekly contact with Plaintiff and Defendant SPOUSE1 as he arrived at the residence to collect his two children for weekend visits. At Boyle's invitation, Plaintiff spent Christmas Eve with Boyle and his two children, who had previously lived with Plaintiff, immediately after SPOUSE1 announced her intention to divorce Plaintiff.

136. Defendant KCSD knew or should have known of the on-going violations of civil rights of Plaintiff, Defendant SPOUSE1, and Defendant SPOUSE2, and failed to protect Plaintiff and others. Defendant KING COUNTY failed to properly supervise and direct the actions of Defendant KCSD, and failed to protect Plaintiff and to cause agencies and departments in its direct control to properly excise their legal authority to protect Plaintiff's civil and constitutional rights.

137. Plaintiff, together with his ostensible Defendant SPOUSE2, purchased the assets of STEVE'S MAINTENANCE in 1990, with the legal assistance of Robert Hibbs("Hibbs"), an attorney at Short, Cressman & Burgess PLLC, in Seattle, Washington. As a fraudulent inducement to Plaintiff, Defendants offered, during the initial discussions of the purchase, U.S. Small Business Administration assistance for performance bonding of the company. This offer of assistance, crucial to success of a small contracting firm with extensive public works projects, was withdrawn immediately after Plaintiff's purchase.

138. The company, renamed ALLIANCE, was destroyed by a series of defalcations, including contract receivables theft; a bonding company introduced to Plaintiff by TLH, another cover operation of Defendants, which was seized by the State of Utah Insurance Commissioner shortly after ALLIANCE's payment of thousands of dollars for its issuance of a soon worthless performance bond on ALLIANCE's subcontract project for the Port of Seattle Aviation Department; and a delayed, then rapidly accelerated schedule for the Port of Seattle Aviation Department project which forced the hiring of a large number of poorly motivated workers.

139. On knowledge and belief, the forced hiring for the Port of Seattle Aviation Department project was used in 1992 to effectively conceal members of a Defendant CIA paramilitary unit in ALLIANCE for approximately one year, in coordination with Defendant SECRET SERVICE. On knowledge and belief, Hibbs was then one of Plaintiff's minders assigned by Defendant SECRET SERVICE, and a government attorney supporting Defendant CIA's Pacific Northwest operations.

140. Sometime between late 1992 and early 1994, Hibbs told Plaintiff about starting a real estate war, and described to Plaintiff his extended visit to Fiji. Some time during late 1992 or early 1993, when Plaintiff visited Hibbs residence to view windstorm damage and provide an asbestos abatement estimate, Hibbs showed Plaintiff a commemorative golden Colt .45 caliber pistol. This incident was nearly identical to an incident several years earlier at Moller's residence shortly after Moller returned from the South Africa ATM project.

With benefit of much hindsight and many years experience in this area, Plaintiff has come to understand these cryptic comments as methods of conveying information which cannot be discussed with persons, such as Plaintiff, lacking the necessary security clearance.

141. Hibbs reported the pistol missing soon thereafter, due to an alleged theft by a member of ALLIANCE's cleanup team which had performed asbestos abatement in his Mercer Island, Washington residence subsequent to structural damage from the windstorm. Hibbs used this alleged theft as a ruse to reduce payment for the project to ALLIANCE.

142. Hibbs bears a strong physical resemblance to Aldrich Ames, then assigned to the Defendant CIA's Langley, Virginia headquarters. On knowledge and belief, it is common practice for senior SECRET SERVICE, CIA, and senior personnel of other police powers and intelligence operations of the United States to have one or more body doubles, for security and operational purposes. These personnel are assigned to different parts of the U.S. and engage in coordinated movements to obscure the movements of the agents for security and operational purposes.

**Programmed Destruction of Companies**

**And Induced Personal Bankruptcy**

143. ALLIANCE's financial condition deteriorated as a result of the defalcations described above and lack of availability of contract performance bonding. Ostensibly as a favor to Plaintiff, Defendants arranged a deposit of $80,000 cash in an escrow account held in the name of ALLIANCE to secure additional bonding capacity for the company. Approximately 24 hours later, the Defendants removed these funds from ALLIANCE. This action triggered a visit by a Defendant IRS agent to the company investigating cash transfers exceeding $10,000. On knowledge and belief, employees of Defendant SECRET SERVICE were the initiators of this transaction, triggering the interest of Defendant IRS. This action is part of a pattern of practice by Defendants to trigger the interest of other Defendants and other regulatory agencies against Plaintiff and his companies.

144. During a search for additional financing and bonding for ALLIANCE, Plaintiff was introduced to Jerry Cornwell ("Cornwell"), on knowledge and belief, a former agent of Defendant CIA with a self-described history of assignments in Libya in the 1980s under commercial cover, and subsequently employed by Defendant SECRET SERVICE while known to Plaintiff, including during Cornwell's personal service contract relationship with ALLIANCE, and Plaintiff's subsequent employment relationship with PAN, involving Cornwell as its Chief Executive Officer.

145. Cornwell suggested Plaintiff consider a reverse merger and financing with a Vancouver Stock Exchange ("VSE") company for ALLIANCE. Lacking other financing alternatives, Plaintiff invested considerable time, resources, and several thousand dollars of ALLIANCE cash in professional services required to complete a reverse merger, and in numerous trips with Cornwell to Vancouver, Canada. This effort failed, and ALLIANCE subsequently failed.

146. At inception, ALLIANCE had received bank loan financing from US Bank at normal commercial rates. As a result of financial stress resulting from Defendants' pattern of excessive expenditures during Plaintiff's early operation of ALLIANCE during which period Defendants were experienced and he was not, as well as a contrived dispute over contract receivables, more than two-thirds of the company's net worth was wiped out in the first six months of operation. Plaintiff's alleged financial partner, on knowledge and belief, also an employee of Defendants, withdrew his financial support.

147. Plaintiff worked at ALLIANCE for three years thereafter with no compensation as he struggled to pay employees and creditors. US Bank withdrew after a time and Plaintiff was forced to seek receivables financing from PACIFIC FINANCIAL SERVICES, Bellevue, Washington at a usurious rate of 72 percent per annum, with a still higher rate to be applied upon any default, as no other firm would finance the company, and it had legal obligations to complete other contracts. A loan advance related to a Port of Seattle Aviation Department project and to professional services required to complete the VSE financing

grew under the default provision of the loan agreement from approximately $20,000 to approximately $65,000 in a few months.

148. PACIFIC FINANCIAL SERVICES, which paid ALLIANCE employees directly during most of the pendency of the Port of Seattle Aviation Department project, also failed to pay payroll and other taxes due, creating an employment related tax liability exposure of several hundred thousand dollars for Plaintiff. Plaintiff personally estimated and reported these taxes to Defendant IRS and to Defendant STATE OF WASHINGTON after discovering this practice. Plaintiff was visited while recovering from a hospitalization for deep vein thrombosis, by an agent of Defendant IRS. No collection action was undertaken in this matter against the Plaintiff by Defendant IRS. Defendant STATE OF WASHINGTON, in accordance with its policy, barred Plaintiff from owning more than fifty percent of any business in the State of Washington unless Plaintiff paid the employment taxes related to the business failure of ALLIANCE.

149. Plaintiff had signed a personal guarantee of the PACIFIC FINANCIAL SERVICES obligations of ALLIANCE. Plaintiff, being unemployed, was unable to make any payments or to afford legal counsel to defend himself in court. A judgment was entered by PACIFIC FINANCIAL SERVICES, which ostensibly garnished Defendant SPOUSE2's wages. On knowledge and belief, PACIFIC FINANCIAL SERVICES was controlled and operated by Defendants, and used, in part, to illegally control the finances and affairs of Plaintiff.

150. In Fall 1993, Plaintiff agreed with Defendant SPOUSE2 to file for personal bankruptcy to maintain their already fragile relationship and to shield Defendant SPOUSE2's income and assets from further claims. Defendant SPOUSE2 identified the attorney to be used in this matter. During the course of the preparing the filing for U.S. Bankruptcy Court, in the presence of the bankruptcy attorney, Defendant SPOUSE2 suggested that the primary residence, the only significant asset of Plaintiff and Defendant SPOUSE2 protected by the bankruptcy proceeding, be sold as part of the bankruptcy

proceeding. Plaintiff objected, the attorney remained neutral and Defendant SPOUSE2 eventually dropped the proposal.

151. Plaintiff's Defendant SPOUSE2 also caused tax liabilities to be created on Plaintiff's federal income tax account with Defendant IRS as a result of her failure to pay estimated self-employment taxes throughout the operation of her software consulting business from approximately 1995. Plaintiff and Defendant SPOUSE2 filed jointly, so Plaintiff's tax liability, including interest and penalties, was continually increased throughout the operation of Defendant SPOUSE2's in-home business. Refunds due Plaintiff were used by Defendant IRS to offset Defendant SPOUSE2's unpaid tax liabilities as reflected in Plaintiff's tax account.

152. Plaintiff's ostensible spouse, Defendant SPOUSE2, also encouraged and arranged the refinancing of Plaintiff's primary residence through AmeriQuest Mortgage, and, in doing so, caused Plaintiff to incur a prepayment penalty of approximately $10,000 when Plaintiff was later forced to sell the residence to avoid foreclosure, the circumstances of which are described later in this Complaint.

153. On knowledge and belief, Defendant SPOUSE2 was not Plaintiff's legal spouse but was one of a series of person's engaged by Defendants for the purpose of fraudulently impersonating the role of Plaintiff's spouse.

154. Plaintiff did not come to consider the use of a series of persons impersonating one person, including, without limitation, his spouse, by Defendants, until he reviewed a series of very provocative acts, including an assault and the destruction of glass art anniversary gifts, in the late stages of the marriage to SPOUSE2 during the 2006 period and thereafter. Plaintiff has only recently come to understand the use of doubles, substitutes, and long separations, by Defendants to engage in a pattern of real property equity stripping and personal property asset stripping under color of marriage, using impersonation and fraudulent marital communities as a technique to coerce, manipulate and illegally control Plaintiff's life, affairs, and resources from the early 1980s to 2005.

155. Plaintiff's full realization of this fraudulent practice of Defendants came as a result of what he considered a personal relationship in the New York area in 2008 described later in this Complaint, which also consisted of several individuals playing parts of the relationship. This fraudulent relationship was also organized, orchestrated, managed, and terminated by Defendants, continuing their pattern of illegal interference with Plaintiff's rights.

156. During the course of Plaintiff's relationship with Defendant SPOUSE2, Jerry Cornwell ("Cornwell"), Chief Executive Officer of Defendant PAN commented on his alleged shared relationship of a female companion with a twin brother. Chuck Hadjinian, General Manager of CNA, commented on the divorce of a close family friend who determined he was gay after many years of marriage to a woman. On knowledge and belief, Cornwell and Hadjinian were agents of Defendant SECRET SERVICE with privileged and confidential knowledge of the facts regarding Plaintiff's relationship with the persons he knew as a single individual and as his spouse.

157. Defendants actively planned, organized, orchestrated, managed, distressed, and terminated these marital and professional relationships, and assigned and rotated individuals to maintain these impersonations. Defendants constructed fraudulent marital communities and professional relationships as part of their pattern of control and violation of Plaintiff's civil and constitutional rights, and knowingly and willfully failed to protect Plaintiff from these violations by other Defendants.

158. After several months of depression, which Plaintiff believed at the time related to failure of ALLIANCE, but which, on knowledge and belief, was actually the result of Defendants operation of the Biomedical Manipulation Device, Plaintiff began a search for employment. Plaintiff contacted Cornwell, who reported being engaged as Chief Executive Officer by PAN, to secure financing through a subsidiary of Credit Lyonnais Laing ("CLL") which subsidiary was ostensibly an investment banking firm in London, England, which operated internationally primarily in the mining industry.

159. Lacking employment alternatives, Plaintiff joined PAN in Fall 1993, worked with PAN's subsidiaries in California and Minnesota, arranged an office sublease in the space above Hibbs' Seattle, Washington office, and travelled with Cornwell twice to London in their efforts to secure financing for PAN.

160. Cornwell offered Plaintiff below market price options in PAN stock prior to the financing when PAN's stock was at record high prices. Plaintiff required that the CLL financing be completed as a condition of accepting these options, to avoid a significant tax exposure with no financial resources to pay the taxes on the value of these options. The CLL financing failed. PAN paid Plaintiff irregularly, in small amounts, throughout this process, with a promise of greatly increased compensation upon completion of the CLL financing. During this process, a $100,000 plus payment on a project receivable, part of which had been promised by Defendants for several months to meet Plaintiff's pressing financial obligations, was allegedly illegally converted by a receivables financing factoring company for one of PAN's subsidiaries, leaving PAN in financial extremis, and destroying Defendants fraudulent promises of any significant income to Plaintiff from his entire period of employment with PAN. On knowledge and belief, these actions were further fraudulent manipulations and misrepresentations in the Defendants long-running series of plans and actions to coerce, manipulate, and illegally control Plaintiff.

**Defendants Trafficking To Control Plaintiff For Future Abuses**

161. Unbeknownst to Plaintiff, Aldrich Ames, a high ranking Defendant CIA officer, who on knowledge and belief, is, was, or strongly resembled Hibbs, his apparent security double, was arrested during the Plaintiff's second trip to London with Cornwell in early 1994, which lasted approximately three to four weeks. The CLL financing failed during that trip. On knowledge and belief, Defendants arranged for Plaintiff to be infected by a virus immediately prior to his departure from London. Plaintiff subsequently endured five weeks of illness related to this virus and a hospitalization related to deep vein thrombosis which occurred as a result of the illness and a subsequent injury to Plaintiff's lower back as the

result of both inactivity, and, on knowledge and belief, operation of the Biomedical Manipulation Device by Defendants.

162. Plaintiff made this connection between Ames arrest, the timing of his trip to London in 1994 and the resultant illness, in June 2010, after careful review of coincidental timing of these events, the similarities in appearance of Ames and Hibbs, Hibbs cryptic comments noted above, and with newfound understanding of the overall pattern of events.

163. Cornwell ostensibly arranged an alternative financing with, on knowledge and belief, another of Defendants' cover operations in the Seattle, Washington area, known as Glengarry in 1994, which also failed.

164. On knowledge and belief, the employment at Defendant PAN, the failure of the alleged CLL financing, and the offer of stock options priced to generate a tax liability for Plaintiff were purposeful, intentional, and intended to control the movements and finances of Plaintiff during the pendency of the Ames investigation, his arrest, and thereafter. Defendants, continuing their pattern of penury, peonage, forced labor, and trafficking of Plaintiff, terminated the PAN operation. Plaintiff was again unemployed for several months thereafter.

**<u>Fraudulent Offer To Sell Cover Operation to Plaintiff And Repetitive Periods of Forced Labor And Unemployment</u>**

165. While at PAN in 1994, Plaintiff was contacted by Chuck Lefevre ("Lefevre"), then Chief Executive Officer of NutraSource, a company where Plaintiff had previously been employed on the Board of Directors and as an occasional consultant for strategic planning. Lefevre suggested Plaintiff join the Board of Directors of PACIFIC PIPELINE. Plaintiff joined the Board in early 1994, subsequently was asked by PACIFIC PIPELINE's Chief Executive Officer Vito Perillo to join the company as a consultant in Spring 1994, then as Chief Operating Officer. Lacking other employment alternatives, Plaintiff joined in Summer 1994 and was nearly immediately confronted with the problematic implementation of a new

software system. Plaintiff worked extremely long hours through the software implementation process, and was terminated in early 1995.

166. Plaintiff continued to work at PACIFIC PIPELINE in 1995 for several months on a buyout of the company agreed by the Board of Directors. Bank America Business Credit, an asset based lending unit of Bank of America in Los Angeles, reviewed Plaintiff's plan and made a financing commitment of $10,000,000 for the buyout and operation of the company. PACIFIC PIPELINE's Chief Executive Officer Vito Perillo, allegedly the company's sole shareholder backed out of the arrangement at the last moment prior to closing of the transaction, allegedly because his former spouse would not agree to forego a $500,000 loan guarantee in conjunction with the sale of the company. On knowledge and belief, the failure of this transaction was a continuing element of Defendant's on-going illegal scheme to control Plaintiff, his personal and financial affairs, and the illegally implanted Biomedical Manipulation Device.

167. On knowledge and belief, Defendant PRAY reported PACIFIC PIPELINE fired its largest customer, Barnes and Noble, at a meeting in New York City in spring 1995. PACIFIC PIPELINE began losing money very rapidly, and was subsequently closed. On knowledge and belief, the company had actually been a cover company used by Defendants for various investigations and intelligence operations aimed at individuals and groups in the Pacific Northwest, then to investigate discounting practices in the book publishing industry.

168. Defendants also described to Plaintiff a scheme under which small publishers were exposed to financial ruin by encouraging those small publishers to overprint copies of their consigned, self-published books, which were placed in large chain outlets in large quantities, failed to sell, and were later returned unsold to the small publisher. Since Plaintiff was unaware of the circumstances of his employment at the time, he did not consider that Defendants were in fact fraudulently inducing these small publishers to financial ruin, and subsequent entanglement in regulatory and other difficulties, as targets of Defendants illegal actions.

169. On knowledge and belief, Defendants never intended to sell PACIFIC PIPELINE to Plaintiff. PACIFIC PIPELINE was used by Defendants to, along with legitimate intelligence matters, continue their pattern of peonage, forced labor, and trafficking of Plaintiff; to control and manage Plaintiff's finances, employment, and personal affairs; to secure the Biomedical Manipulation Device and to conceal its illegal implantation; to conceal from discovery their pattern of illegal control and abuse of Plaintiff; and to control Plaintiff as a means of concealing their role in violation of Executive Orders of the President in the Saudi Arabian Airlines project.

170. During his employment at PACIFIC PIPELINE, Plaintiff was requested to consider engaging CNA, to assist in improvements to the company's warehouse operations, including its possible relocation. No work was performed on this project due to the problems with the software implementation. After the collapse of the PACIFIC PIPELINE acquisition, Plaintiff attempted to contact a number of firms regarding employment opportunities, including CNA.

**Programmed Project Sabotage And Failure**

171. After several months of unemployment, Plaintiff was asked to join employees of CNA in the preparation of a sales proposal for the Reno, Nevada area warehouse operations of Henry Schein, Inc., a medical supply company. Plaintiff traveled with CNA employees to make the sales presentation in Melville, New York. The presentation was unsuccessful but CNA subsequently asked Plaintiff to join CNA as an employee in November 1995. Lacking other alternatives, Plaintiff joined CNA.

172. Plaintiff was immediately employed on a project for Sony Corporation in Springfield, Oregon. After several months, this project was completed, and Plaintiff began work for a series of software companies in acquisition and transition, such as Sierra Online and Davidson, collectively known eventually as CUC. Plaintiff, together with Defendant PRAY, and other CNA employees, worked at CUC in Torrance, California. Plaintiff continued on this project long after other CNA employees had left for other work, working

very long hours for a total of approximately 16 to 18 months, to complete the project. On knowledge and belief, the project was extended during this period by sabotaging key software and sortation equipment. The sorter for the project, supplied by AccuSort, ultimately failed an acceptance test by CUC, the project was terminated, and subsequent litigation was settled by arbitration.

**Entanglement In Simultaneous CIA Traitorous Employee Investigations**

173. Unbeknownst to Plaintiff until 2010, Harold James Nicholson ("Nicholson"), a high ranking Defendant CIA officer who bears a strong resemblance to Plaintiff's then ostensible brother-in-law Wayne Graevelle, was arrested in 1996 during the course of Plaintiff's employment on the CUC project. Plaintiff had been introduced to Wayne Graevelle by Defendant SPOUSE2 in 1988 or 1989, around the same time Plaintiff met attorney Hibbs, apparent double of Defendant CIA's executive Aldrich Ames, and Defendant FBI's agent Vanderberry.

174. On knowledge and belief, Graevelle is, was, or strongly resembles Harold James Nicholson ("Nicholson"), the highest ranking Defendant CIA officer ever criminally convicted by the U.S. On knowledge and belief, it is common practice for senior Defendant SECRET SERVICE, Defendant CIA, and senior personnel of other Defendants, police powers, and intelligence operations of the United States to have one or more body doubles, for security and operational purposes.

175. Plaintiff made the connection between Plaintiff's family activities with his ostensible Defendant SPOUSE2, the Graevelle family, including son Nathan, and the Nicholson case in the spring of 2010. Nicholson's picture appeared in the New York Times newspaper as a result of Nicholson's use of his son, Nathaniel, in his attempt to secure further payments from his Russian handlers, agents of the former KGB.

176. Subsequent to the CUC project, Plaintiff was eventually promoted to Managing Director and took over day to day operations of Defendant CNA, including client projects at Anchorage International Airport; the Boeing Delta IV rocket assembly plant for the Air

Force in Decatur, Alabama; a new warehouse distribution system for Nikken, in Irvine, California; warehouse and manufacturing facilities for Media Arts Group in Morgan Hills, California; design of an automated storage and retrieval system for the Utah State Alcohol and Beverage Commission; and a variety of commercial, intelligence, and security related projects. As capital spending slowed in 1999, Defendant CNA's work slowed, financial profits turned to losses, and layoffs ensued.

177. During the spring of 2001, Defendant CNA was asked to work on a project at Puget Sound Naval Shipyard, to reconfigure the secure industrial area production facilities for the U.S. Navy. The project was delayed by the security alert in the summer of 2001 and the attacks of September 11, 2001. Plaintiff negotiated the scope of work and fees for this project. Work was eventually scheduled to commence in September, 2002. During 2002, Defendant CNA was also asked to work on a rapid design project for HUDD Distribution, which project was, on knowledge and belief, a logistics support facility for Defendant CIA's international operations. Plaintiff participated in these activities and in other projects.

178. During this period, Plaintiff took a 25% pay deferral to help support Defendant CNA's cash flow and to maintain other employees so Defendant CNA could continue its operations in a slow sales period. The firm's ostensible owner, Larry Cook ("Cook"), effectively withdrew $100,000 of Defendant CNA's cash and allocated it for his own use, making these funds unavailable to meet the pressing cash flow needs of the business.

179. During this period, Defendant PRAY informed Plaintiff that the internet firewall at CNA was malfunctioning and would be turned off, leaving Plaintiff's work computer, and others, unprotected from malicious hacker attacks. Plaintiff's ostensible spouse, Defendant SPOUSE2, in a telephone call to Plaintiff, warned of the hacking of the e-mail address book on her computer containing, among others, Plaintiff's work e-mail address. Shortly after the telephone call from Defendant SPOUSE2, Plaintiff's CNA work personal computer was filled with hundreds of messages purveying, by Plaintiff's reference to the subject line in these messages, apparently obscene materials, which continued unabated for several months

before Plaintiff left CNA. On knowledge and belief, Defendants orchestrated this attack and distribution of obscene materials to Plaintiff as a form of assault on Plaintiff's character and reputation, and to engage other Defendants and other law enforcement agencies in wrongful investigations of Plaintiff, continuing and heightening Defendants pattern of illegal control, manipulation, and wrongful actions against Plaintiff.

180. Plaintiff became concerned about Cook's motivations in reserving approximately $100,000 of CNA funds critically needed to fund ongoing operations. Plaintiff elected not to begin the Puget Sound Naval Shipyard project due to the prospect of slow payment of CNA as a subcontractor on the project, the withdrawal of resources by Cook, and the now suspiciously familiar prospect of a tax liability trap developed by Defendants to entrap Plaintiff. Plaintiff recognized these circumstances as similar to past circumstances but did not make a connection with any particular party or group as being a primary and ongoing source of these types of adverse actions toward Plaintiff. Plaintiff left CNA in August 2002.

**Abuse Of Political Rights**

181. While at CNA, Plaintiff had reacquainted himself with the Seattle, Washington area staff and members of AeA, then known as the American Electronics Association, beginning in 1999. Plaintiff's former employer, LAZERSOFT, had been a neighbor to AeA at its Bothell, Washington location in 1987 through 1989. Plaintiff volunteered to lead the AeA Higher Education Task Force, an initiative to secure additional funding for technology and engineering education from Washington state government. This initiative added approximately 750 technology education slots at community colleges and colleges all across the state.

182. Plaintiff was later asked by the AeA's Board of Directors to chair the organization. Plaintiff became heavily involved with state political leaders and with technology industry leaders in Washington. Plaintiff also joined the national board of directors for AeA. Plaintiff joined the AeA's political action committee in the state of Washington, made contributions,

and assisted in allocating committee contributions to various political campaigns in Washington.

183. Plaintiff was asked to consider the possible leadership of the Washington Higher Education Coordinating Board by Sue Crystal, known to Plaintiff as a member of then Governor Locke's staff. On knowledge and belief, this process and Plaintiff's involvement in AeA was used as a ruse and subterfuge by Defendants to facilitate the gathering of intelligence information regarding government operations and regarding Plaintiff by various intelligence personnel of Defendants associated with AeA and by Defendant WSP. Defendant WSP and other Defendants knew or should have known of Plaintiff's circumstances, including, without limitation, Defendants systematic peonage, forced labor, trafficking, and interference with Plaintiff's civil and constitutional rights. Numerous executive branch employees of Defendant STATE OF WASHINGTON were involved in this process over several years. Defendants failed to act in accordance with their constitutional and statutory obligations to investigate and protect Plaintiff's rights, and to direct agencies under their control in such actions.

**Check Fraud And Tortious Business Interference**

**In Plaintiff's Consulting Company**

184. Plaintiff left CNA in August 2002 to form PERFORMA with Defendant PRAY, a fellow employee also known to him from a prior association with NutraSource. Defendant PRAY and Plaintiff worked together on projects for Chelan Fruit and for Defendant SHIPNOW. Defendant SHIPNOW was run by Michael Kurgan ("Kurgan"), a vendor on a prior project for CUC, conducted by Plaintiff, Defendant PRAY, and other employees of Defendant CNA. Kurgan signed a series of fraudulent checks to PERFORMA. On knowledge and belief, Kurgan and Defendant SHIPNOW were part of a series of agents and cover operations of Defendants.

185. On knowledge and belief, Defendant PRAY, as known to Plaintiff, was substituted by other persons in that role during the course of the project. Defendant SHIPNOW provided

PERFORMA more than $107,000 in bad checks for services rendered by Defendant PRAY, shuffled its assets to an offshore tax haven in the British Virgin Islands, merged with Kewill plc, a company headquartered in Great Britain, conveyed Defendant SHIPNOW's United States customers and assets to Defendant KEWILL, a subsidiary of Kewill plc, and failed to pay PERFORMA, effectively destroying PERFORMA's finances.

186. PERFORMA sued Defendant SHIPNOW in the Superior Court for King County Case number 04-2-03886-3 SEA, and Kewill Systems plc and Kewill Solutions North America, Inc., in Federal District Court for Western District of Washington, Civil Action No. CV04-1783Z.

187. During 2003 and early 2004, Plaintiff engaged in an intensive series of sales calls and sales proposals, traveling throughout the United States, which were, on knowledge and belief, merely sham sales interviews concocted by yet another of Defendants front operations, known as Defendant TSL. No business was ever conducted with any Defendant TSL lead. Defendants repeatedly tortiously interfered with Plaintiff's business interests and attempts to engage in interstate commerce to cause Plaintiff to expend PERFORMA resources on fraudulent business opportunities concocted by Defendants.

**Forced Labor And Unpaid Compensation**

188. In 2004, Plaintiff was also forced to sue CNA to secure more than $100,000 in back pay due from CNA, as all prior collection attempts had been rebuffed by CNA.

189. With more than $250,000 exposed to loss in 2004 as a result of Defendants $107,000 Defendant SHIPNOW check fraud, CNA's $100,000 plus unpaid prior compensation, and approximately $35,000 in legal fees due before a trial commenced on either issue, Plaintiff lacked the resources to proceed to King County, Washington Superior Court.

190. CNA settled for the full original amount of the claim in an arbitration. Plaintiff received the original claim amount, less interest and attorneys' fees. Washington law provides for double damages, legal fees, interest, and costs in such cases.

191. On knowledge and belief, the timing of the arbitration and settlement, and of the Defendant SHIPNOW check fraud, were arranged by Defendants to extract the maximum amount of legal fees, and insure Plaintiff could not responsibly instruct counsel to proceed to Court.

192. Plaintiff used Defendant LHS as legal counsel for personal matters and for PERFORMA'S organization and as its ongoing legal counsel. On knowledge and belief, Defendants used this law firm as part of its pattern of illegal control of Plaintiff. This pattern of practice continued Defendants pattern of illegal control of Plaintiff, his affairs, activities, and finances.

193. During this process, Charter Bank, Bellevue, Washington, on knowledge and belief used by Defendant SECRET SERVICE to cover banking operations of Plaintiff and PERFORMA, and referred to Plaintiff by Michael Larson, attorney and partner at Defendant LHS, legal counsel to Plaintiff and PERFORMA, offered Plaintiff and PERFORMA an additional $125,000 loan, which would have doubled their indebtedness to the bank. Plaintiff declined this offer. On knowledge and belief, this offer to extend additional credit and the other financial difficulties of PERFORMA were intended by Defendants to further manipulate and illegally control Plaintiff, his life, affairs, and finances.

194. Defendant PRAY referred Plaintiff to SOFTSELECT, on knowledge and belief a cover operation of Defendant SECRET SERVICE, in 2002. Plaintiff expended considerable time and resources pursuing SOFTSELECT sales leads, including, on knowledge and belief, other cover assets of Defendant SECRET SERVICE posing as commercial enterprises.

195. Among these sales leads was BIO-LAB, located in Lawrenceville, Georgia. Plaintiff visited BIO-LAB in 2003 with Defendant PRAY to present a sales proposal for PERFORMA's services, and made numerous phone calls, several sales proposals, and another trip to discuss business opportunities. No business was ever conducted with BIO-LAB or any other SOFTSELECT lead. Defendants repeatedly tortiously interfered with Plaintiff's

business interests to cause Plaintiff to expend PERFORMA resources on fraudulent business opportunities concocted by Defendants.

196. BIO-LAB experienced a major warehouse fire some months later. A similar chemical warehouse fire occurred in early 2006, shortly after Plaintiff relocated to Boston, Massachusetts. On knowledge and belief, this and other similar events, apparently inspired by or intended to emulate such destructive or violent activities have occurred as a result of Defendants election to raise the public visibility of Plaintiff. Plaintiff's life has been endangered and his ability to exercise his rights as a citizen have been effectively destroyed by these and other acts of Defendants.

197. During 2003 through 2005, Plaintiff continually attempted to operate PERFORMA. Plaintiff experienced substantial financial distress, and symptoms of depression which caused Plaintiff to apparently suddenly develop a plan for his own destruction, and immediately seek medical treatment, which symptoms and plan were, on knowledge and belief, caused by Defendants operation of the Biomedical Manipulation Device and psychological programming techniques of Defendants.

198. On knowledge and belief, the entire Defendant SPOUSE2 relationship, ostensible marriage, family, and divorce scenario; Plaintiff's employment at PAN, PACIFIC PIPELINE, CNA, PERFORMA's legal, financial, and tortious business interference problems, and the related violations of Plaintiff's rights during this period, were the result of a decision by the Defendants to purposefully entangle Plaintiff in the espionage investigations of Nicholson and Ames, beginning in or about 1988, to maintain control of the Biomedical Manipulation Device illegally implanted and operated, and to conceal their ongoing pattern of violations of rights and illegal control of Plaintiff, all for the convenience and benefit of Defendants. During this period, Plaintiff emerged from bankruptcy; rebuilt his credit and his residence; and avoided numerous constructive fraud attempts to entrap undertaken by Defendants; while engaged in close, constructive contact with SPOUSE2,

various agents of Defendants and foreign intelligence services, and with Ames/Hibbs, and Nicholson/Graevelle.

199. The alleged marriage of Plaintiff to Defendant SPOUSE2 was dissolved in early 2005. Defendant SPOUSE2 secured substantially all the appreciation from the value of their personal residence in the divorce proceeding. After the divorce was finalized, Plaintiff was forced to rapidly sell the personal residence he had rebuilt and expanded over fifteen years to avoid foreclosure. Having rebuilt his credit subsequent to the induced bankruptcy in 1995, Plaintiff's FICO credit score in the Fall 2005 was 770, out of a possible 820. In 2005, after Plaintiff undertook the forced sale of his home in Kirkland, Washington to avoid a foreclosure, he was penalized approximately $10,000 for early payment on a mortgage arranged by Defendant SPOUSE2, forwarded substantially all the proceeds from the sale to Defendant SPOUSE2 as required by terms of the fraudulent dissolution agreement.

200. The proceeds from forced sale of the residence failed to satisfy Plaintiff's indebtedness to Defendant SPOUSE1 related to the real property equity stripped in the dissolution. Plaintiff was left with liabilities to his alleged spouse, Defendant SPOUSE2, of approximately $125,000. On knowledge and belief, SPOUSE2's legal counsel were actually employed by Defendants, and knew, or should have known, they were representing a fraudulent interest in a fraudulent marital community, created for the purpose of illegally controlling the Plaintiff, his affairs and finances. Defendants contrived this set of fraudulent events to maintain and enhance their illegal control of Plaintiff.

201. In September 2005, Plaintiff surrendered control of PERFORMA to Defendant PRAY due to the poor financial performance and his inability to meet current financial personal obligations. Plaintiff later moved from his apartment in Kirkland, Washington to avoid eviction due to inability to pay.

202. Plaintiff came to understand in June 2010, as a result of due diligence in preparing this Complaint, that attorneys of Defendant LHS, ostensibly representing Plaintiff equally with Plaintiff's ostensible partner Defendant PRAY, who had organized and presented for

Plaintiff's approval a limited liability company form of organization for PERFORMA, failed to register this entity with the State of Washington, thereby exposing Plaintiff to unlimited legal liability, as the entity would be treated as a partnership due to Defendant LHS's failure to properly register the limited liability company. Plaintiff's attorneys Defendant LHS were, on knowledge and belief, actually employed by Defendants.

203. On knowledge and belief, PERFORMA and Plaintiff were destroyed by the now familiar formula – theft of assets, this time though check fraud by a key customer – a front organization called Defendant SHIPNOW; an ostensible partner Defendant PRAY who insisted on continuing the work at SHIPNOW while fraudulent checks were being written based upon an alleged promise to cover these checks through proceeds of a pending merger with Kewill plc, parent of Defendant KEWILL– while himself having a conflict of interest and agenda to control Plaintiff as a government employee of other Defendants; dissipation of Plaintiff's and PERFORMA's cash, credit, and other assets, through the need to expend resources on litigation to cover the constructive frauds previously undertaken by Defendant CNA; expenses related to Plaintiff's interstate travels for PERFORMA in an attempt to close additional sales to what were, in fact, cover operations of Defendant and tortious business interference; and a fraudulent marital community which stripped equity from Plaintiff's real property, left him heavily indebted to his alleged former spouse; and being forced by loss of his residences due to Defendants contrivance of a lack of income to donate or give away virtually all his personal property. On knowledge and belief, PERFORMA and Defendant SPOUSE2 were used by Defendant SECRET SERVICE and other Defendants to continue their illegal control and violation of the civil and other rights of Plaintiff, to arrange for his involvement in still further intelligence operations, and to facilitate coercion by Defendant SECRET SERVICE, other Defendants, and by other police powers persons not known to Plaintiff.

**Interference With Rights, Retaliation, And Tampering,**

**Under Color Of Law**

204. Further complicating Plaintiff's dire financial straits as contrived by Defendants, on knowledge and belief, sometime during the 1998 to 2003 period, the THORPE infiltration of Saudi Arabian Airlines and other events leading to indirect retaliations for Defendant CIA covert actions, including the African Embassy bombings in 1998, the USS Cole suicide attack in Yemen in 2000, and the September 11, 2001 attacks, were traced back to Defendant CIA's Directorate of Operations and Defendant SECRET SERVICE's support operations in Seattle, Washington and New York, New York.

205. On knowledge and belief, Plaintiff's innocent involvement with this prior sequence of events, as a result of Defendants assignment of Plaintiff and illegal control, peonage, forced labor, and trafficking of Plaintiff, became known to others.

206. As a non-covert person, an ordinary citizen lacking any special purpose immunity or security clearance, or other privileged, insider status as an ordinary commercial employee of Defendants cover operations, Plaintiff became a convenient target for various illegal, coercive, and corrupt undertakings to avoid disclosure of the culpability of Defendant CIA and Defendant SECRET SERVICE in the preceding sequence of operations including the infiltration of THORPE.

207. Plaintiff noticed an unusually strong presence of undercover officers and agents beginning about 2002, eventually including extraordinary cover for his travels, staged traffic accidents, interferences, blocking operations, and a series of very unusual interventions, such as carefully timed power outages, intended to secure and control his movements. Defendants coercion, pressure, efforts to illegally control, and their use of the Biomedical Manipulation Device increased very substantially during the 2002 to 2005 period.

**<u>Interference With Rights and With Correspondence Before Government Agencies And Departments</u>**

208. Defendants interfered with Plaintiff's right to vote in Fall 2005 by intercepting his call to the King County, Washington, Office of Elections to change his legal address for

purposes of voting, and promising to change said address. Said address did not occur and Plaintiff received a forwarded ballot from his former address, nullifying his right to vote.

209. Plaintiff attempted to exercise his rights to petition government under the First Amendment to the U.S. Constitution in late summer and fall 2005. In three separate mailings using various delivery methods, these petitions were at least partially intercepted by Defendants or others not known to Plaintiff, and not delivered to various agencies and departments of the U.S. as addressed. Plaintiff borrowed funds, and traveled to Washington, DC, after each of the three partial interceptions, to hand deliver the petitions to various government agencies. In several cases, personnel in the reception area of the department or agency to which the petition was addressed and being hand delivered by Plaintiff observed as the petition was received by an individual who come from outside the building being delivered.

210. On knowledge and belief, when Plaintiff called the Defendant JUSTICE in 2006 to inquire regarding the status of his petition, his call was misdirected to Defendant JUSTICE's Planning Division, rather than its Tort Claims unit, and his message went unreturned. Plaintiff again took the initiative to locate the proper contact phone number, and a subsequent message to the Tort Claims division went unreturned.

**Reckless Endangerment, Forced Liquidation**
**of Personal And Real Property, And Induced Homelessness**

211. Plaintiff left his Kirkland, Washington apartment in mid-December 2005, effectively homeless, making forced donation of tens of thousands of dollars of personal property accumulated over the past fifteen years. After an approximately one week stay, Plaintiff, on the urging of his alleged sister to leave, and fearing for his family's safety as a result of the very intensive police presence in his life, moved to Boston, Massachusetts. Plaintiff became homeless after four months in Revere, Massachusetts hotel when funds ran out.

212. Plaintiff remained in the Boston area for 21 months from December 2005 to August 2007. Plaintiff was forced to enter a daily lottery with other homeless men for nightly bed

space at Defendant PSI, sometimes shuffled to other shelters, and spent one rainy night in the nearby Boston Police Department precinct house lobby, over a period of approximately six weeks from late March to May 2006.

213. Plaintiff was then ostensibly screened into and maintained by, on knowledge and belief, Defendant SECRET SERVICE in a specially staffed homeless shelter known as Holy Family Shelter, a unit of Defendant PSI, from approximately May 2006 to August 2007. On knowledge and belief, both the staff and residents of Holy Family Shelter were employees of Defendant SECRET SERVICE, other Defendants, and other law enforcement agencies.

214. During this period, Plaintiff was under continuous guard, and experienced significant harassment and frequent biomedical manipulation, including daily severe headaches related to the use of the Biomedical Manipulation Device and an infrared laser device to disrupt his vision for eight to nine months until approximately January 2007. On knowledge and belief, the infrared laser device is typically used by Defendant SECRET SERVICE snipers to spot, range, and target their weapons.

215. Plaintiff was forced to proceed into this eight to nine month long nearly daily barrage of manipulated physical assaults on his brain chemistry, central nervous system, and vision. Plaintiff was driven from Holy Family Shelter to Defendant PSI each day. Plaintiff then walked to his normal morning destination, Boston Public Library, approximately one mile. Plaintiff was forced to proceed with extreme caution to avoid being caught in traffic while suffering the endangering effects of blurred vision, loss of peripheral vision, and very painful headache symptoms. Plaintiff typically spent mornings in the Boston Public Library ("Library") attempting to read through these two to three hour long vision blinding headaches. Plaintiff could not close his eyes in the Library as a guard would arrive and instruct anyone who appeared to be sleeping to leave the Library.

216. Plaintiff's daily schedule included several hours looking for work through Defendant TWP, a job search center operated by Defendant JVS and funded, in part, by Defendant CITY OF BOSTON, and, later, through Defendant HOPEFOUND, then operating as the

employment services department of Shattuck Shelter in Boston, Massachusetts. Plaintiff was specifically directed to perform this job search effort, and to engage in certain interviews and drug tests, ostensibly for the purpose of locating housing, by his Holy Family counselor, as a condition of remaining in the shelter. No offers of housing or other benefits were forthcoming from this process used as coercion, illegal control, and to illegally harass and search Plaintiff. Plaintiff was gifted and expended approximately $60 during this initial year of homelessness, having no other resources

217. On knowledge and belief, Plaintiff's job search efforts at both Defendant TWP and Defendant HOPEFOUND were systematically obstructed by Defendants, to continue their long term fraudulent pattern of illegal control, trafficking, forced labor, and peonage of Plaintiff. At this and all other times, Defendants JVS, TWP, HOPEFOUND, CITY OF BOSTON and other Defendants failed to properly supervise and direct employees, servants, agents, agencies, and departments under their direct and indirect control to insure equal protection of Plaintiff's civil and constitutional rights.

**Forced Labor, Manipulation, Tampering, Retaliation And Endangerment**

218. In Summer 2007, Plaintiff was interviewed by an individual introduced by employees of Defendant HOPEFOUND in the employment services department of Shattuck Shelter as Mr. Shinsecki ("Shinsecki"). Plaintiff did not receive any form of writing from Shinsecki or the Defendant HOPEFOUND employees who introduced Shinsecki, so Plaintiff is uncertain about the proper spelling of this individual's presumed name. Plaintiff engaged in a long discussion with Shinsecki, a white male in his late 50s or early 60s not previously known to Plaintiff, regarding his circumstances, interests, vocational goals, and provided Shinsecki a syllabus and reading list regarding rule of law issues. Shinsecki took this information and returned to his reported New York, New York area location. On knowledge and belief, Shinsecki was the false identity of a New York, New York area intelligence or police powers official working for Defendants.

219. After the Shinsecki interview in summer 2007, Plaintiff interviewed with Defendant HAMILTON, Managing Director of Defendant IMA, known to Plaintiff at the time as Boyden Global Executive Search, ostensibly for employment with Pittsburgh Technology Council, and with Defendant MCKEON of Defendant GESG for employment at Defendant ESTABLISH and/or Defendant DAVIS.

220. On knowledge and belief, no serious consideration of employment at Pittsburgh Technology Council was ever contemplated. This interview series was merely a maneuver and fraudulent charade to cover the trafficking and forced relocation of Plaintiff to the New York, New York metropolitan area for the convenience of Defendants. At this and all other times, Defendants HAMILTON, MCKEON, IMA and GESG failed to properly act and to properly supervise employees, contractors, agents, and servants under their control to insure that Plaintiff's civil and constitutional rights were protected. On knowledge and belief, Defendants CIA, SECRET SERVICE, CITY OF NEW YORK, NYPD, PANYNJ, PAPSD, STATE OF NEW YORK, STATE OF NEW JERSEY, NJSP, STATE OF CONNECTICUT, PSI, HOPEFOUND, TWP, JVS, CITY OF BOSTON, and other Defendants not known to Plaintiff, were aware, and acted together and separately to aid, abet, and facilitate this trafficking, forced labor, peonage, endangerment, and other illegal acts described in this Complaint, against Plaintiff, his interests, and civil and constitutional rights, and failed, at this and all other times, to properly act and to properly supervise employees, agents, contractors, and servants under their control.

**Relocation, Trafficking To New York For Forced Labor,**

**Convenience Of Defendants**

221. Defendant ESTABLISH offered Plaintiff a position as Vice President in an offer letter signed by Defendant DRUMM, which, lacking other employment alternatives, he accepted. While Plaintiff's offer letter was on Defendant ESTABLISH letterhead, Plaintiff's compensation and medical benefits were paid by and through Defendant DAVIS.